**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **3:21-CR-143** |
| **v.** | : | **(JUDGE MANNION)** |
| **SUSAN MELISSA NICKAS,** | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Pending before the court is defendant Susan Melissa Nickas' motion to suppress evidence and statements pursuant to Fed.R.Crim.P. 12(b). The recorded statements were made when she was interviewed, prior to her arrest, by three detectives with the Monroe County District Attorney's Office and a trooper with the Pennsylvania State Police, ("PSP"). (Doc. 79). Nickas and her co-defendant Jeremy Edward Johnson, are charged with two counts in an Indictment, to wit: Count 1, Conspiracy to Distribute Controlled Substances, (heroin and fentanyl), Resulting in Death, in violation of 21 U.S.C. §846 and §841; and, Count 2, Distribution of a Controlled Substance Resulting in Death, in violation of Title 21 U.S.C. §841(a)(1). (Doc. 1).[1] The alleged victim regarding the charges against the defendants is Joshua

---

[1]Since the complete procedural background of this case is stated in the court's July 8, 2022 Memorandum which addressed Nickas' motion for a discovery disclosure timetable, (Doc. 112), it is not repeated herein.

Kiernan, and his date of death is December 11, 2020. Nickas seeks the court to suppress her incriminating statements alleging that they were obtained unlawfully before she was given her Miranda rights, and she seeks to suppress the evidence detectives obtained without a warrant, including her cellular ("cell") phone. Nickas contends that all of her statements and all of the evidence seized should be suppressed since detectives violated her 4th and 5th Amendment rights.

For the reasons discussed below, and after consideration of the briefs and the evidence submitted, including the recording of Nickas' interview, Nickas' suppression motion will be **DENIED IN ITS ENTIRETY** without the need for an evidentiary hearing.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**[2]

As a backdrop, detectives with the Monroe County DA's Office were investigating the death of Joshua Kiernan who died of a fentanyl/heroin

---

[2] For present purposes, the court utilizes portions of the factual background as stated in Nickas' brief, (Doc. 80), in the government's opposition brief, (Doc. 91 at 4-13), as well as Nickas' audio recorded interview conducted on March 11, 2021, which was submitted by Nickas and the government on a CD. (Docs. 83 & 92). The factual background of this case is also contained PSP trooper Nicolas De La Iglesia's narrative Offense Report, (Doc. 79-5), and in the Affidavit of Probable Cause in support of the March 11, 2021 search warrant for Nickas' cell phone data filed by Monroe County Detective Kim Lippincott, (Doc. 79-6). For present purposes only, this background, as averred in the Report and the Affidavit, is incorporated herein by reference. The court also notes that it has listened to Nickas' entire recorded interview from March 11, 2021. (Doc. 92).

overdose on December 11, 2020. On March 11, 2021, at about 9:45 a.m., three Monroe County detectives, (Lippincott, Vanlouvender and Orlando), and PSP trooper De La Iglesia, (hereinafter collectively referred to as the "detectives"), went to Nickas' residence to interview her after witnesses were interviewed, including Kaleigh Watson, Kiernan's fiancé, and after Nickas was identified by the trooper from analyzing a data extraction from Jeremy Johnson's cell phone. (*See* Doc. 79-5). The detectives wanted to ask Nickas about her relationship with Johnson and to see what she knew about Kiernan's death. The detectives did not have a warrant for either Nickas' arrest or to search her house or her cell phone. Nor did Nickas know in advance that the detectives were coming to her house to speak with her. The detectives then proceeded to conduct a "knock and talk" with Nickas on her front porch at her residence after Nickas agreed to speak with them. One of the detectives had a digital recording device and activated it. Nickas was advised that her discussion with detectives was being recorded on the recording device.

Detectives then began questioning Nickas about her relationship with Johnson and her possible connection to the overdose death of Joshua Kiernan. Nickas was asked if she knew Johnson through her fiancé Arron Bensley, who died. Nickas admitted she and Johnson were drug users, and that they had shared heroin in the past. Detectives told Nickas they had text messages from her to Johnson, and had quite a bit of communications between them. Detectives wanted to know from where Johnson was getting

3

his drugs. One detective told Nickas he was trying to help her out and that she could help herself out. Nickas wanted to know how the investigation involved her. Detectives told her that she was basically implicated and that they wanted her to help them out with her side of her story. Nickas worried aloud that the detectives were trying to trick her into saying something. Nickas' mother was also present at the house near the porch door and detectives wanted to know if Nickas wanted to talk outside of her mom's presence.

Nickas told detectives she would give Johnson rides to New Jersey to get drugs but the connections for the drugs where Johnson's. Detectives asked Nickas about the trips she and Johnson took to New Jersey (Paterson area) and whose GPS they used to get there.

Detectives asked Nickas how long she was making drug runs with Johnson, and she stated that they started after Arron Bensley died. Detectives wanted to know how often Johnson got drugs and how much he would get. Detectives wanted to know the details of Johnson's drug buys, and Nickas indicated that they were "street deals". Nickas admitted that she and Johnson communicated through texts on her cell phone and not Facebook or social media.

Detectives asked Nickas about the cell phone they could see she had in her pocket and how long she had it. Detectives told Nickas they needed information on her cell phone and that she could consent to give the phone to them or they would take it and get a search warrant for it. Detectives

explained that information on her cell would be evidence for court. Detectives explained a drug deal resulting in death charge under Pennsylvania law and, that this was the basis of their investigation and why they were talking to her. Nickas emphasized that she did not sell any drugs and that she just gave Johnson a ride to pick up drugs. Detectives told Nickas they wanted the location information on her cell phone to see where Johnson was buying his drugs from. Detectives told Nickas they wanted to track down the sources of the drugs Johnson bought. In short, Detectives told Nickas they were investigating Kiernan's death and basically wanted to see where he got his drugs.

Nickas asked detectives if she could "call someone", but then stated, "It's fine. I don't care." The trooper responded that Nickas could call whomever she wished, including an attorney. Nickas wanted to know why detectives needed her cell phone and they explained the information they wanted. Lippincott said that at this point "you are on our team." However, the detectives also told Nickas that they "can't make any promises" about what would happen "down the road" depending upon what they found on her cell phone.

Nickas asked to speak to Detective Chris Shelly (an FBI TFO), who she knew and trusted, but was not present. Lippincott, also an FBI TFO, stated that she knew Shelly and Nickas said she would do what Shelly told her to do. Detectives told Nickas they wanted her to help them out and to go

over her drug relationship with Johnson, and they told Nickas she may have to testify in court.

Nickas was then told that she could go inside and speak with her mother if she wanted to, but she would have to leave her phone with them if she went into the house.

Detectives again explained that they were there to investigate Kiernan's death and the chain as to how he got his drugs and wanted to know Nickas' "link in the chain."

Detectives then asked Nickas again about her passcode for her cell phone and then began to ask how to get into her phone. Nickas asked detectives what were the implications if she gave Johnson money to buy drugs at times and detectives told her that Johnson was the guy they were looking at, but if evidence implicated her, then there were no promises that she would not be charged. Detectives then explained to Nickas that if she helped them do their job they would put in a good word for her with the prosecutor. Nickas again wanted to talk with Det. Shelly.

Shelly was then contacted by phone and spoke to Nickas and, she told him she did not want to incriminate herself. Shelly told Nickas to trust the detectives and that they were just trying to solve the case and that she was a big part of it.

Detectives again asked Nickas if she would consent to the search of her cell phone and she asked if she said "yes" would she lose any protections. Detectives told her they could get a search warrant for her cell

phone information even without her consent. Finally, one detective essentially stated, I just need a yes or no, do you want me to get a search warrant or will you consent, it's your choice. Nickas then consented to the search of her cell phone.

The trooper then explained the cell phone consent form to Nickas and read the form to her. Nickas signed the consent to search form the trooper gave her which indicated that she was "willingly, knowingly, voluntarily, and without coercion,...." was giving her consent to "to make a full search of my cell phone." (*See* Doc. 91-1, Consent to Search Cell Phone Form). Lippincott witnessed Nickas' signature on the consent form. Then detectives told her that they would not forget her cooperation.

After Nickas' interview ended and her cell phone was taken, despite her consent, Lippincott prepared a search warrant application for Nickas' cell phone that was approved by a Monroe County judge later that same day. (Doc. 79-6 & Doc. 91-2). The LG cell phone, after it was mirror imaged, was returned to Nickas on March 12, 2021, by Lippincott. (Doc. 91-3). The search of Nickas' cell phone revealed evidence which contradicted the story provided by Nickas on March 11, 2021, including hundreds of text messages allegedly evidencing her drug trafficking activities with Johnson.

On May 25, 2021, detectives arrested Nickas with a warrant that was issued after she was federally indicted with Johnson on May 18, 2021. (Doc. 1). Detectives also seized her cell phone, which was the same phone Nickas gave them on March 11, 2021, incident to her arrest, and later obtained a

federal search warrant for the contents of her phone on May 27, 2021. (Doc. 79-7).

## II.   LEGAL STANDARDS FOR SUPPRESSION MOTION

### A.   Fourth Amendment

The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Lange v. California, —— U.S. ——, 141 S.Ct. 2011, 2017, 210 L.Ed.2d 486 (2021). *See also* United States v. Place, 462 U.S. 696, 701 (1983) (generally, "the [Supreme] Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.").

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490

(W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753-55, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Generally, a search "requires a warrant supported by probable cause." Carpenter v. United States, ––– U.S. ––––, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018) (citing Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

"Under the exclusionary rule 'evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.'" United States v. Lara-Mejia, 482 F.Supp.3d 281, 293 (M.D. Pa. 2020) (quoting United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). "This prohibition also applies 'to the fruits of the illegally seized evidence.'" Id. "The rule operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" Id. (citations omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)

(citation omitted). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id. (citation omitted). Stated otherwise, where the search or seizure was conducted without a warrant, the government "must establish by a preponderance of the evidence when the seizure occurred and that it was supported by reasonable suspicion." U.S. v. Lowe, 791 F.3d 424, 432 n. 4 (3d Cir. 2015). That is, the government then must show that the warrantless search falls within "certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

There are a few "specifically established and well-delineated exceptions" to searches without a warrant. U.S. v. Harrison, 689 F.3d 301, 306 (3d Cir. 2012).

"Consent is an exception to the 'requirements of both a warrant and probable cause.'" United States v. Stabile, 633 F.3d 219, 230 (3d Cir. 2011) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.")). Searches pursuant to voluntary consent are not in violation of the Fourth Amendment "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Florida v. Jimeno, 500 U.S. 248, 250-251, 111 S.Ct. 1801 (1991).

10

"Consent must be voluntary, may be express or implied, and need not be knowing or intelligent." United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005). As the court in United States v. Wright, 514 F. Supp. 3d 635, 654 (M.D. Pa. 2021), explained:

> When making a determination about the voluntariness of consent, courts are to consider "the totality of the circumstances," including such factors as: "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009). *See also,* United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994) ("Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. Thus whether consent was given is to be resolved by examining all relevant factors, without giving dispositive effect to any single criterion.") (internal citations and quotation marks omitted). In addition, the "setting in which the consent was obtained [and] the parties' verbal and non-verbal actions are also relevant" and the Government need not inform the subject of his or her right to refuse consent. Stabile, 633 F.3d at 231 (internal citations and quotation marks omitted).

"The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." *Id.* at 655 (quoting United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989)).

Another exception to the warrant requirement applies where "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Klein v. Madison, 374 F.Supp.3d 389, 411 (E.D. Pa. 2019) (quoting Kentucky v. King, 563 U.S. 452, 460, 131 S.Ct. 1849 (2011)). The

exigent circumstances exception is applied on a "case-by-case basis," Birchfield v. North Dakota, 579 U.S. 438, 136 S.Ct. 2160, 2180 (2016), which requires courts to consider the "totality of circumstances." Missouri v. McNeely, 569 U.S. 141, 149, 133 S.Ct. 1552 (2013). Exigent circumstances include, among others, "danger to the lives of officers or others" or "the possibility that evidence may be removed or destroyed." U.S. v. Anderson, 644 Fed.Appx. 192, 194 (3d Cir. 2016) (citing U.S. v. Coles, 437 F.3d 361, 366 (3d Cir. 2006)). "The common thread is imminence—'the existence of a true emergency.'" U.S. v. Mallory, 765 F.3d 373, 384 (3d Cir. 2014) (quoting U.S. v. Simmons, 661 F.3d 151, 157 (2d Cir. 2011)). For example, "[e]xigent circumstances exist when officers are in hot pursuit of a fleeing suspect," Id. (citing Coles, 437 F.3d at 366), "when they 'reasonably believe someone is in imminent danger,'" Id. (quoting Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006)), or "when they reasonably believe that they must act 'to prevent the imminent destruction of evidence.'" Id. (quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943 (2006)). The burden is on the government to demonstrate that "exigent circumstances justified a search," Id. at 383, a burden which is "heavy." Id. (quoting Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S.Ct. 2091 (1984)).[3]

---

[3]"Prior decisions of [the Supreme] Court, [ ], have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated.'" Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091 (1984) (citation omitted).

### B.    Fifth Amendment

In <u>U.S. v. Sater</u>, 477 F.Supp.3d 372, 379 (M.D. Pa. 2020), the court discussed a defendant's 5th Amendment rights in the context of a suppression motion and stated:

> The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" Pennsylvania v. Muniz, 496 U.S. 582, 589, 110 S.Ct. 2638 (1990) (quoting Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602 (1966)). To ensure a person's Fifth Amendment rights are protected, Miranda held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444, 86 S.Ct. 1602.

In <u>U.S. v. Whiteford</u>, 676 F.3d 348, 362 (3d Cir. 2012), the Third Circuit explained:

> The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 130 S.Ct. 2250, 2262 (2010). A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986).

In <u>United States v. Hodge</u>, 2017 WL 1345219, *13 (D. V.I. Feb. 24, 2017), the court discussed a waiver of rights and stated:

To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." Briscoe, 69 F. Supp. 2d at 741 (quoting United States v. Tyler, 164 F.3d 150, 158 (3d Cir. 1998)) (quotations omitted). Courts also must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id*. (citing Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983)) (internal citations omitted). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, the defendant's physical and mental state, and other pressures affecting the defendant's powers of resistance and self-control. *Id*. at 741 n.1. "*Miranda* rights will be deemed waived only where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir. 1996) (quoting Alston v. Redman, 34 F.3d 1237, 1253 (3d Cir. 1994)).

## III.   DISCUSSION

This court has jurisdiction over Nickas' motion to suppress under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Fed.R.Crim.P. 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

Nickas argues that the search and seizure of her cell phone on March 11, 2021 without a search warrant violated the 4th Amendment, and that her pre-*Miranda* incriminating statements to the detectives were not voluntarily made after they came to her house unannounced and interrogated her on her front porch, part of the curtilage, of her house. As such, Nickas contends

that the evidence obtained from her cell phone and her statements should all be suppressed for trial.

### A. Consent to the Seizure and Search of Nickas' Cell Phone

Nickas first moves to suppress the seizure and search of her cell phone on March 11, 2021, as in violation of the 4th Amendment, arguing that her consent was not voluntary based on the totality of the circumstances.

After listening to the complete audio recorded interview between Nickas and the detectives, which has been detailed above, the court finds that although the detectives were persistent in asking Nickas about consenting to the seizure and search of her cell phone, in the end her consent was knowingly made and voluntary. The interview lasting about 55 minutes showed that Nickas was repeatedly advised of the purpose of the investigation and why detectives wanted to examine Nickas' cell phone. Nickas' statements to detectives indicated that she understood the investigation, the process, and why she was being interviewed.

Further, the government points out, (Doc. 91 at 18), in its brief:

the detectives could not have been clearer with the process that they intended to engage in regarding seizing the phone and searching the phone and they repeated the process multiple times. At no time during the encounter did Nickas ask the detectives to leave. At no time did Nickas ask for a lawyer. At no time did Nickas say anything to shoo the detectives away. She asked many, many questions, all of which were answered by the detectives.

No doubt that "[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the

search or seizure itself." <u>Wright</u>, 514 F.Supp.3d at 645 (quoting <u>United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304 (1985)</u>).

Here, Nickas was allowed to consult with her mother at the house as well as TFO Shelly, whom she knew and trusted. In fact, when she spoke to Shelly, she stated that she had already consented to the seizure of her cell phone by detectives. In short, Nickas was neither naïve nor ignorant of what was happening on March 11, 2021. Nickas was a competent adult who could understand and speak English. As in the <u>Wright</u> case, 514 F.Supp.3d at 655, Nickas could "speak clearly and in a reasoned fashion, and understood the questions being asked of her and was appropriately responsive", and "[t]hus, the 'age, education, and intelligence' of [Nickas] demonstrate that she was capable of understanding the events of [March 11, 2021] and was capable of voluntarily consenting to the [seizure and] search [of her cell phone]."

Nor does the court find that "the repetition or duration of the encounter with the [detectives] was excessive or somehow affected the voluntariness of [Nickas'] consent." *Id*. Further, despite the fact that detectives told Nickas that if she did not consent to the seizure of her cell phone they would get a search warrant for it, there is no evidence that Nickas was coerced or pressured to give her consent. *See id*. at 657 ("With respect to Avent's suggestion that she was misled by the police officers about the D.A.'s office issuance of a search warrant, this claim does not support a finding that the asserted presence of a search warrant affected her decision to allow the officers into her home or to voluntarily consent to a search."). At no time did

Nickas tell detectives that she wanted to wait until they obtained a search warrant for her cell phone even though she was advised that if she did not consent a warrant would be obtained. Also, similar to the <u>Wright</u> case, *id*. at 655, it is "clear that [Nickas] was informed of the [detectives'] purpose for being at the house and requesting to search [her cell phone], and that she was not mislead as to what the [detectives] were seeking." Thus, the court finds that the mentioning of a search warrant did not affect the voluntariness of her consent. *See id*. at 658. In any event, after Nickas gave her consent and signed the form, and before any data or content on Nickas' cell phone was obtained by detectives, Lippincott applied for a search warrant for Nickas' cell phone and a Monroe County judge found sufficient probable cause, based on the detailed affidavit provided, to issue the warrant within five hours after it was seized. (Doc. 79-6).

At the conclusion of the interview, Nickas was read the consent form for the seizure of her cell phone by the trooper and she voluntarily signed it. She also freely gave the detectives the passcode for her cell phone. From the recording, it is abundantly clear that Nickas knew what she was signing and understood its text. *See id*.

Thus, "upon consideration of the totality of the circumstances in making a determination about the voluntariness of [Nickas'] consent to the [seizure and] search of [her LG cell phone], the Court finds that the Government has sustained its burden of establishing by a preponderance of the evidence that [Nickas] consented to the [seizure and] search of her [cell phone], …, and

that this consent was voluntary and not the product of duress or coercion." *Id*. at 658-59. Thus, the detectives' seizure of Nickas' cell phone while seeking a search warrant did not violate the 4th Amendment. As such, Nickas' motion to suppress the seizure and search of her cell phone will be denied, and the court will permit the government to use at trial all of the evidence obtained from Nickas' cell phone.[4]

## B. Nickas' Statements to Detectives

Next, Nickas seeks to suppress all of her statements made during the March 11, 2021 "knock and talk" interview with detectives on her front porch, claiming that she did not receive her <u>Miranda</u> rights prior to making

---

[4]The government contends that Nickas' cell phone was in plain view and that the exigent circumstances exception to the warrant requirement also applies to the seizure and search of Nickas' cell phone since the detectives reasonably believed that if they did not seize the phone at the time of her interview Nickas would have deleted evidence on her phone or destroyed her phone. However, since the court has found that Nickas provided her voluntary consent to the seizure and search of her cell phone, the court need not address these alternate theories for the seizure of the phone. Nonetheless, the court notes that the detectives would be authorized to seize and secure Nickas' cell phone to prevent the destruction of evidence while they were seeking a warrant, effectively what they really did here. In United States v. Place, 462 U.S. 696, 701 (1983), the Supreme Court stated that "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant," the "seizure of the property, pending issuance of a warrant to examine its contents [is permitted], if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *See also* Riley v. California, 573 U.S. 373, 388 (2014) (noting that based on Supreme Court precedent, it was "sensible" for the defendants to concede "that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant").

statements which implicated her in criminal drug conduct. The government contends that since Nickas was not in custody and voluntarily spoke with them during the interview, her constitutional rights were not violated.

The government has the burden of proving, by a preponderance of the evidence, that Nickas' statements made during her interview were voluntary. *See* Sater, 477 F.Supp. 3d at 383; *see also* United States v. Paine, 2021 WL 3674616, *3 (E.D. Pa. August 19, 2021) ("The Government bears the burden of proving statements were 'the product of an essentially free and unconstrained choice' by a preponderance of the evidence.") (citation omitted). If the government fails to meet its burden, Nickas' involuntary statements are not admissible in evidence for any purpose. *See* Paine, 2021 WL 3674616, *3 ("Involuntary statements made to law enforcement are inadmissible."). "Due process requires a suspect's confession to be voluntary if it is to be admitted into evidence", and "[a] confession is involuntary if the suspect's will was overborne in such a way as to render his confession the product of coercion." Sater, 477 F.Supp. 3d at 384 (internal citations omitted). Additionally, "[i]t is well established that an involuntary confession may result from psychological, as well as physical, coercion", Miller v. Fenton, 796 F.2d 598, 603 (3d Cir. 1986), and "[t]he question in each case is whether the defendant's will was overborne when he confessed." *Id.* at 604. The court considers, in part, "the specific tactics utilized by the police in eliciting the admissions," and "the details of the interrogation" in determining whether the officer's statements and actions, as well as the conditions, were so coercive

19

that they deprived the defendant of "his ability to make an unconstrained, autonomous decision to confess." Miller, 796 F.2d at 604.

Nickas moves to suppress her incriminating statements under the 5th Amendment with respect to her 55-minute interview on her front porch with detectives on March 11, 2021. Nickas essentially contends that the interview on the porch of her home was a custodial interrogation with the purpose of getting her to make incriminating statements implicating her in illegal distribution of controlled substances with Johnson. She maintains that the court should suppress all her statements because she was not advised of her *Miranda* rights. Nickas also claims her incriminating statements were involuntary because the detectives basically coerced her statements and performed the "knock and talk" to try and get her to make incriminating statements. The government argues that Nickas was not in custody at the time in question and she was never under arrest and, that her statements were freely given despite the fact that she was not read her *Miranda* rights by detectives prior to her interview.

The recorded interview indicates that detectives did not arrest Nickas nor advise Nickas of her *Miranda* rights before the interview commenced, that it lasted about 55 minutes and took place entirely on Nickas' front porch. The three detectives and one PSP trooper did not put Nickas in handcuffs or physically restrain her in any way. In fact, Nickas was allowed to move from the porch area if she wanted and to go inside her house to speak with her mother. Although Nickas was allowed to go into her house, the detectives

told her that she had to leave her cell phone with them since they could readily determine from their discussions with Nickas that there was evidence of the drug crimes under investigation on her phone and, since the detectives reasonably feared Nickas could attempt to destroy the evidence on her phone if she took it into her house before they could obtain a warrant. *See* United States v. Place, 462 U.S. 696, 701 (1983).

Nor did the detectives remove their firearms at any time during the interview. Significantly, Nickas did not tell the detectives that she did not wish to speak with them and she did not indicate that she wanted to end the interview at any point. In fact, Nickas asked many questions of the detectives and they repeatedly explained why they wanted to speak with her and the purpose of their investigation. After the interview, the detectives left Nickas' porch without arresting or detaining her.

As the court in United States v. Paine, 2021 WL 3674616, *3 (E.D. Pa. Aug. 19, 2021), recently explained:

> The Fifth Amendment's prohibition against compelled self-incrimination requires that *Miranda* warnings precede custodial interrogations. *See* Edwards v. Arizona, 451 U.S. 477, 481–82 (1981). If *Miranda* warnings are not issued a "presumption of compulsion" applies, Oregon v. Elstad, 470 U.S. 298, 307 (1985), and "evidence resulting from the questioning must be suppressed." United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444–45 (1966)). A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Law enforcement is not required to give *Miranda* warnings outside of a custodial interrogation. *See* United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006).

Custody requires "circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 565 U.S. 499, 508–09 (2012). To determine whether a person is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation ... a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (internal citations and quotations omitted); *see also* J.D.B. v. North Carolina, 564 U.S. 261, 262 (2011) ("[T]he test involves no consideration of the particular suspect's 'actual mindset'") (citation omitted). Courts must consider the totality of circumstances surrounding an interrogation to determine how an individual would have assessed his freedom of movement. *See id.* (quoting Stansbury v. California, 511 U.S. 318, 322, 325 (1994) (per curiam)).

Additionally, "[r]elevant circumstances include the location and duration of questioning, statements made during questioning, the presence or absence of physical restraints and the release of the interviewee at the end of questioning." *Id*. (citation omitted). The court in Paine, *id*., also stated that the Third Circuit considers the following factors in determining "whether the interviewee voluntarily participated" in an interview, namely:

> whether other coercive tactics, like hostile tones of voice or display of weapons, were used; whether the questioner believed the interviewee to be guilty and, if so, whether this was revealed to the interviewee; whether the interviewee was told he was not under arrest; and whether the interviewee agreed to meet knowing that he would be questioned about a criminal offense. *See* United States v. Ludwikowski, 944 F.3d 123, 132 (3d Cir. 2019).

The "freedom-of-movement test" is not the only condition to determine "*Miranda* custody", and "Courts must also determine whether the relevant environment presents the same inherently coercive pressures as the type of

22

station house questioning at issue in *Miranda*." *Id*. (internal quotations and citations omitted).

No doubt that "[c]oercive police activity is [a] necessary predicate to a finding of involuntariness", and "voluntariness also requires a causal connection between the police conduct and the confession." Paine, 2021 WL 3674616, *3 (internal citations and quotations omitted). Also, "[l]aw enforcement is permitted to use some psychological tactics to elicit a confession." *Id*. As such, "a confession is not rendered involuntary simply because the police procured it by using psychological tactics." *Id*. (citation omitted).

In determining whether Nickas' statements to detectives were due to coercion, the court looks at "the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused to determine whether the defendant's will was overborne when [s]he confessed." *Id.* at *4 (internal quotations and citations omitted). The court should also consider "police tactics such as the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Id.* (citations omitted). Further, the court should consider defendants' age, education, intelligence, as well as "background and experience, including experience with the criminal justice system." *Id.* (citing Ludwikowski, 944 F.3d at 135). As the government indicates, (Doc. 91 at 32), "Nickas is a 46-year old adult female

with no mental limitations." Also, Nickas knew TFO Shelly and it was clear from her conversations with detectives that she had an understanding of the criminal process, particularly regarding drug cases. Further, when the trooper conducted a criminal history inquiry of Nickas, he found a "prior drug related conviction." (Doc. 79-5 at 2).

The court finds that the 55-minute "knock and talk" on Nickas' porch was not custodial and, thus Nickas was not entitled to *Miranda* warnings. (See Doc. 79-6 at 7). The instant case is very similar to Paine, 2021 WL 3674616, *4, in which the court found as follows:

> Paine's interview was noncustodial so he was not entitled to *Miranda* warnings. The interview setting—Paine's front porch at 2:00 p.m.—was not an environment that "presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see also* United States v. Willaman, 437 F.3d 354, 360 (3d Cir. 2006) (citing approvingly United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned *on his own turf*, ... the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (emphasis in original)). Plus the detectives spoke to Paine for just twenty minutes, never threatened, touched or restrained him in any way and Paine was free to walk back into his home as soon as the interview ended. *See* Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (half-hour interview noncustodial where defendant voluntarily went to police station and was free to leave after); United States v. Morgan, 562 F.App'x 123, 130 (3d Cir. 2014) (two-hour interview noncustodial in room with two unblocked exits where officers were not hostile and did not restrict interviewee's movement).

The court finds that Nickas' interview was "objectively noncustodial", and that "a reasonable person would not have felt unable to leave under these circumstances." *Id.* (finding that "[t]he interview took place in an

24

unenclosed space, [i.e., defendant's porch to his house], it was not prolonged or intensive, the detectives did not use any physical threats and [defendant] was free to go back inside immediately after the interview.").

Nor does the court find that Nickas' statements were involuntary, and there is no evidence that her "will was overborne in such a way as to render [her] [statements] the product of coercion." *See* Arizona v. Fulminante, 499 U.S. 279, 288 (1991)); *see also* Paine, 2021 WL 3674616, *4 (holding that "there is no evidence the detectives obtained [defendant's] confession using psychological coercion sufficient to overbear his will."). In short, the court finds that based on the evidence submitted by the parties, the government has met its burden of proving Nickas' statements on March 11, 2021 were voluntary.

Additionally, there is no evidence that Nickas herself requested to consult with an attorney before or during her interview with detectives. *See* Whiteford, 676 F.3d at 362 (defendant must make "an objectively identifiable request for counsel" to invoke his Fifth Amendment rights.) (citing Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350 (1994)).[5]

Based on the totality of circumstances regarding Nickas' interview on March 11, 2021, the court finds that the government has met its burden of

---

[5] It should be noted that Nickas' mother can be heard in the background, at one point, asking "Does she need a lawyer or anything?" The court does not construe Nickas' mother's question as an objectively identifiable invocation of the right to counsel on behalf of her adult, competent daughter.

establishing Nickas' statements were voluntary and the result of her free and deliberate choice and not the result of threats or coercion or promises. Also, there is no credible evidence that Nickas was coerced by the detectives or that they forced her into making her statements and answering questions. In fact, the recording of the interview fails to support any claim of coercion. As such, the court finds that Nickas' statements were voluntary and not coerced and, they will not be suppressed for trial. Thus, Nickas' motion to suppress her statements will be denied in its entirety.

### C. Evidentiary Hearing

Finally, the court will also deny Nickas' request for an evidentiary hearing in this case regarding her motion to suppress. "Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure permits defendants to file 'motions to suppress evidence' before trial, but evidentiary hearings on such motions are not granted as a matter of course." U.S. v. Hines, 628 F.3d 101, 105 (3d Cir. 2010) (citing Rule 12(c)). "To require a hearing, a suppression motion must raise 'issues of fact material to the resolution of the defendant's constitutional claim.'" Id. (quoting U.S. v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996)).

"A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." Id. (citations omitted). The court in

Hines, 628 F.3d at 105, stated that "the purpose of an evidentiary hearing in the context of a suppression motion is to assist the court in ruling upon a defendant's specific allegations of unconstitutional conduct—its purpose is not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact."

The court finds that an evidentiary hearing is not required in the present case regarding Nickas' motion since there has been sufficient evidence already submitted, including the DVD with Nickas' recorded interview, and Nickas' suppression motion does not "set forth and identify for the court specific and concrete 'issues of fact material to the resolution of [their] constitutional claim[s].'" Id. (quoting Voigt, 89 F.3d at 1067).

As such, the court, in its discretion, finds that there is no need for an evidentiary hearing regarding Nickas' suppression motion and her request for a hearing will be denied.

## IV. CONCLUSION

Based on the foregoing, the court finds that the seizure and search of Nickas' cell phone did not violate the 4th Amendment and the evidence obtained from her cell phone will not be suppressed for trial. Further, Nickas' statements to the detectives during her March 11, 2021 interview were made when she was not in custody, and they were made freely and knowingly, and she was not coerced to make the statements based on the totality of the

27

circumstances in which she made them. Thus, Nickas' motion to suppress evidence and her statements, **(Doc. 79)**, will be **DENIED IN ITS ENTIRETY**. An appropriate order will be issued.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: July 20, 2022**
21-143-04